**No. 25-3281**

---

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

———

## UNITED STATES OF AMERICA,

Plaintiff-Appellee,

v.

## ANTHONY TORRES,

Defendant-Appellant.

———

Appeal from the
United States District Court
for the Southern District of California
Honorable Ruth B. Montenegro Presiding

———

## APPELLANT'S OPENING BRIEF

———

Kara Hartzler
FEDERAL DEFENDERS OF
SAN DIEGO, INC.
225 Broadway, Suite 900
San Diego, CA 92101
(619) 234-8467
Attorneys for Appellant

# TABLE OF CONTENTS

INTRODUCTION ................................................................................ 1

JURISDICTIONAL STATEMENT ........................................................ 3

    I.     Basis for Jurisdiction in the District Court ........................... 3

    II.    Basis for Appellate Jurisdiction ............................................ 3

    III.   Bail Status .............................................................................. 3

ISSUES PRESENTED FOR REVIEW ..................................................... 4

    I.     Whether officers had reasonable suspicion of criminal
        activity at the "moment of seizure." ...................................... 4

    II.    Whether § 922(g)(1) violates the Second Amendment as
        applied to Mr. Torres. ........................................................... 4

RELEVANT PROVISIONS .................................................................. 4

STATEMENT OF THE FACTS .............................................................. 5

    I.     In April 2024, Mr. Torres celebrated Chicano Park Day
        with his family and friends. ................................................. 5

    II.    On the evening of Chicano Park Day, Mr. Torres was riding
        in his aunt's car when police began following him. ............ 6

    III.   After Annabel parked and Mr. Torres was crossing the
        street, Officer Wilson orders Mr. Torres to stop. ................. 8

    IV.   After detaining Mr. Torres and asking about weapons,
        police find a gun and charge him with unlawful possession
        of a firearm ........................................................................... 9

    V.    Mr. Torres moves to suppress the gun under the Fourth
        Amendment. ........................................................................ 10

    VI.   Mr. Torres files a motion to dismiss the indictment under
        the Second Amendment. ...................................................... 12

VII. The district court denies both motions and declines to hold an evidentiary hearing. ....................................................... 13

SUMMARY OF THE ARGUMENT ...................................................... 15

ARGUMENT ................................................................................. 16

    I.    Officers had no reasonable suspicion to stop Mr. Torres at the "moment of seizure." ................................................. 16

        A.    Standard of review ..................................................... 16

        B.    No reasonable suspicion of criminal activity existed at the moment of Mr. Torres' seizure ............................... 16

            1.    The government has the burden to show "specific and articulable facts" indicating criminal activity at the "moment of seizure." ....................................... 17

            2.    The only "specific and articulable" facts at the "moment of seizure" were that Mr. Torres was walking away from a car on Chicano Park Day ............................................................... 19

            3.    The district court legally erred by relying on reasons that occurred after the "moment of seizure" or were related to officer safety, rather than suspicion of criminal activity ......................... 23

            4.    Even the factors the district court *could* rely on did not justify a *Terry* stop…………………………....26

        C.    At a minimum, this Court should remand for an evidentiary hearing on the material facts in dispute.. 31

    II.    Mr. Torres' conviction violates the Second Amendment...... 35

        A.    Standard of review ..................................................... 35

B.    Section 922(g)(1) is unconstitutional as applied
       Mr. Torres......................................................................35

CONCLUSION ......................................................................39

CERTIFICATE OF RELATED CASES .................................40

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Federal Cases**                                                         **Page(s)**

*Brown v. Texas*,
443 U.S. 47 (1979) ........................................................ 18, 21, 23, 24

*District of Columbia v. Heller*,
554 U.S. 570 (2008) ............................................................... 36

*Florida v. J.L.*,
529 U.S. 266 (2000) ............................................................ 18, 24

*Lewis v. City of New Orleans*,
415 U.S. 130 (1974) ..................................................................... 22

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
597 U.S. 1 (2022) ......................................................... 12, 14, 15, 36

*Range v. Att'y Gen. United States*,
124 F.4th 218 (3d Cir. 2024) ..................................................... 37, 38

*Rodriguez v. United States*,
575 U.S. 348 (2015) ....................................................................... 31

*Terry v. Ohio*,
392 U.S. 1 (1968) .................................................................. *passim*

*Thomas v. Dillard*,
818 F.3d 864 (9th Cir. 2016) ..................................................... 24, 25

*United States v. Choudhry*,
461 F.3d 1097 (9th Cir. 2006) ........................................................ 16

*United States v. Diaz*,
116 F.4th 458 (5th Cir. 2024) ................................................... 37, 38

*United States v. Dorsey*,
No. 23-2714, 2024 WL 4379733 .................................................. 35

iv

*United States v. Duarte,*
   101 F.4th 657, 662 (9th Cir. 2024) .................................................. 37

*United States v. Duarte,*
   137 F.4th 743 (9th Cir. 2025) (en banc) ........................... 2, 35, 36, 37

*United States v. Eusebio Gonzalez,*
   798 F. App'x 171 (9th Cir. 2020) .................................................. 35

*United States v. Evans,*
   786 F.3d 779 (9th Cir. 2015) ........................................................ 28

*United States v. Garcia,*
   No. 22-50106, 2024 WL 32727 .................................................. 34–35

*United States v. Howell,*
   231 F.3d 615 (9th Cir. 2000) .................................................. 16, 32

*United States v. Job,*
   871 F.3d 852 (9th Cir. 2017) .................................................. 18, 27

*United States v. Landeros,*
   913 F.3d 862 (9th Cir. 2019) ................................................... 28, 31

*United States v. Lopez-Soto,*
   205 F.3d 1101 (9th Cir. 2000) ...................................................... 16

*United States v. Manzo-Jurado,*
   457 F.3d 928 (9th Cir. 2006) ........................................................ 16

*United States v. Mejia,*
   69 F.3d 309 (9th Cir. 1995) .................................................... 32, 34

*United States v. Montero-Camargo,*
   208 F.3d 1122 (9th Cir. 2000) (en banc) .................................... 22, 34

*United States v. Odom,*
   588 F. Supp. 3d 1032 (N.D. Cal. 2022) ......................................... 25

*United States v. Rodriguez,*
   976 F.2d 592 (9th Cir. 1992)......................................................... 23

v

*United States v. Rubio,*
  No. 2:24-CR-00542-MEMF-1, 2025 WL 220949
  (C.D. Cal. Jan. 15, 2025) ...................................................................27

*United States v. Sigmond-Ballesteros,*
  285 F.3d 1117 (9th Cir. 2002) ..................................................... 22, 26

*United States v. Thomas,*
  863 F.2d 622 (9th Cir. 1988) ........................................................... 25

*United States v. Vandergroen,*
  964 F.3d 876 (9th Cir. 2020) ........................................................... 18

*United States v. Vongxay,*
  594 F.3d 1111 (9th Cir. 2010) ............................................. 12, 14, 35

*United States v. Walczak,*
  783 F.2d 852 (9th Cir. 1986) ...................................................... 32, 33

*United States v. Williams,*
  113 F.4th 637 (6th Cir. 2024) ..................................................... 37, 38

*United States v. Willis,*
  431 F.3d 709 (9th Cir. 2005) ........................................................... 18

*Ybarra v. Illinois,*
  444 U.S. 85 (1979) .............................................................. 21, 23, 27

## Federal Statutes

18 U.S.C. § 922 ....................................................................... *passim*

18 U.S.C. § 3742 ................................................................................ 3

28 U.S.C. § 3231 ................................................................................ 3

28 U.S.C. § 1291 ................................................................................ 3

28 U.S.C. § 1294 ................................................................................ 3

## Rules

Fed. R. App. P. 4(b) .......................................................................... 3

vi

**United States Constitution**

U.S. Const. amend. II  .......................................................................... 4

U.S. Const. amend. IV  .................................................................... 4, 17

UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT

| | |
|---|---|
| UNITED STATES OF AMERICA, | U.S.C.A. No. 25-3281 |
| Plaintiff-Appellee, | U.S.D.C. No. 24-CR-1006-RBM-1 |
| v. | |
| ANTHONY TORRES, | **APPELLANT'S OPENING BRIEF** |
| Defendant-Appellant. | |

## INTRODUCTION

Every April, the historic neighborhood of Barrio Logan in San Diego gathers to celebrate Chicano Park Day. To locals, Chicano Park Day represents a celebration of family, community, and Mexican-American culture. To police, it is a "gang holiday" that poses a "threat of violence to the entire community." ER-89.

Anthony Torres is a 21-year-old lifelong resident of Barrio Logan and a volunteer in the restoration of the iconic murals of Chicano Park. He spent Chicano Park Day in 2024 with his family and friends. Around 7:45 p.m., he had gotten out of a parked car and was crossing the street when Officer Braden Wilson ordered him to stop. Mr. Torres complied and turned around. As a result of that stop, the officers found that Mr. Torres had a gun, leading to federal charges for unlawful possession of a firearm and ammunition under 18 U.S.C. § 922(g)(1).

1

But Officer Wilson had no reasonable suspicion to stop Mr. Torres. At the time of the stop, Officer Wilson knew only that Mr. Torres was walking away from a vehicle on Chicano Park Day. This falls short of the "specific and articulable facts" necessary to establish a reasonable suspicion of criminal activity under *Terry v. Ohio*, 392 U.S. 1, 21 (1968). In holding to the contrary, the district court legally erred by relying on facts that occurred *after* the initial seizure, did not create reasonable suspicion of criminal activity, or had no support in the record. What's more, the court refused to hold an evidentiary hearing to resolve the numerous material facts in dispute.

The district court also denied Mr. Torres' motion contending that § 922(g)(1) violates the Second Amendment as applied to him. Though this Court rejected a similar challenge in *United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025) (en banc), Mr. Torres seeks to preserve his argument that the government has not shown that § 922(g)(1) falls within a deeply rooted historical tradition of regulation.

For these reasons, this Court should 1) remand with instructions to suppress the evidence, 2) remand for an evidentiary hearing, or 3) vacate Mr. Torres' conviction on constitutional grounds.

# JURISDICTIONAL STATEMENT

## I.    Basis for Jurisdiction in the District Court

Mr. Torres appeals his convictions of felon in possession of a firearm and felon in possession of ammunition under 18 U.S.C. § 922(g)(1) in the U.S. District Court for the Southern District of California. The district court had original subject matter jurisdiction under 28 U.S.C. § 3231.

## II.   Basis for Appellate Jurisdiction

This Court has jurisdiction over a timely appeal from a final order entered in the Southern District of California, within the Ninth Circuit's geographical jurisdiction. 28 U.S.C. §§ 1291 & 1294(1); 18 U.S.C. § 3742(a). The district court sentenced Mr. Torres on May 16, 2025, and entered a final judgment on May 20, 2025. ER-15. Mr. Torres filed a timely notice of appeal on May 22, 2025. Fed. R. App. P. 4(b). ER-129.

## III.  Bail Status

Mr. Torres is currently incarcerated at MCC in San Diego with a release date of August 30, 2026.

## ISSUES PRESENTED FOR REVIEW

I.    **Whether officers had reasonable suspicion of criminal activity at the "moment of seizure."**

II.    **Whether § 922(g)(1) violates the Second Amendment as applied to Mr. Torres.**

## RELEVANT PROVISIONS

Section 922(g)(1) of Title 18 states:

It shall be unlawful for any person—

(1)    who has been convicted in any court of, a crime punishable by imprisonment for a term exceeding one year . . .

to ship or transport in interstate or foreign commerce, or possess in or affecting commerce, any firearm or ammunition; or to receive any firearm or ammunition which has been shipped or transported in interstate or foreign commerce.

The Fourth Amendment of the United States Constitution states that, "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

The Second Amendment provides that, "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II.

4

## STATEMENT OF THE FACTS

**I.     In April 2024, Mr. Torres celebrated Chicano Park Day with his family and friends.**

Every April, the historic neighborhood of Barrio Logan in San Diego celebrates Chicano Park Day. ER-89, 94, 106, 111. Chicano Park Day commemorates the community's struggle against the construction of a freeway through the neighborhood in 1970. ER-94, 106. Chicano Park itself is decorated with dozens of large murals that the community has created and maintained over the last fifty years. ER-94, 111. Every year, tens of thousands of people attend Chicano Park Day as a celebration of family, community, and Mexican-American culture. ER-94, 111.

Mr. Torres is a young man who was raised in this neighborhood. ER-111. In his spare time, he serves as one of the volunteers who helps clean up Chicano Park and maintain its murals. ER-111. Mr. Torres and his family are "proud of [their] heritage and celebrate it every year on Chicano Park Day." ER-111. So on April 20, 2024, Mr. Torres "spent the day attending Chicano Park festivities with [his] family." ER-111.

But San Diego police view Chicano Park Day differently. According to one officer, "criminal street gangs . . . use this day to promote their gang" by "having several of their members 'post up'" and "'tag' their monikers and Logan gang name all throughout the Barrio Logan neighborhood." ER-106–07. According to another officer, "there

5

are often violent acts committed by Logan Heights gang members on the day of the Chicano Park celebration." ER-115. Officers believe that Chicano Park Day has become "more of a gang holiday" that "poses an increased threat of violence to the entire neighborhood." ER-86, 89.

But in recent years, few incidents of violence have actually occurred on Chicano Park Day. *See* ER-70; Phil Diehl, *Chicano Park returns to roots to commemorate 54 years of spirit*, SAN DIEGO UNION-TRIBUNE, https://www.sandiegouniontribune.com/2024/04/20/chicano-park- returns-to-roots-to-commemorate-54-years-ofspirit. In fact, Barrio Logan has a lower crime rate than many other San Diego neighborhoods. *See* ER-70; Rhea Caoile, *These San Diego neighborhoods had the most crimes in 2023, data shows*, available at https://fox5sandiego.com/news/local-news/these-sandiego-neighborhoods-had-the-most-crimes-in-2023-data-shows/.

## II. On the evening of Chicano Park Day, Mr. Torres was riding in his aunt's car when police began following them.

After spending Chicano Park Day with his family, Mr. Torres was riding in a car driven by his aunt, Annabel Vargas Garcia, at around 7:45 pm. ER-95. Annabel and Mr. Torres decided to pick up a friend of theirs, Jaime Diaz, who was at a nearby house party. ER-95.

But Annabel and Mr. Torres did not know that the attendees of this party were on the police's bad side. About half an hour earlier, officers in a "Street Gang Unit" cruised by this house and saw a group

6

of several dozen people "standing in the front yard drinking alcohol." ER-95. According to police, a few of these people "yelled 'Fuck the police' and raised their middle fingers directly at [the] patrol vehicle." ER-107. An undercover officer in an unmarked police car began surveilling the house. ER-86.

Annabel and Mr. Torres were not at the party and took no part in this incident. But about 30 minutes later, they arrived at the house to pick up their friend, Jaime. ER-107. Two hours earlier, the same Street Gang Unit had stopped Jaime and questioned him about gang activity, believing that Jaime was a "known gang member." ER-119. The officer found no weapons on him. ER-119.

Mr. Torres did not go inside the house or even into the yard— instead, he called for Jaime from outside the gate. ER-95. When Jaime came out, Jaime sat in the back seat, Mr. Torres sat in the front passenger's seat, and Annabel was driving. ER-111.

The undercover officer surveilling the party claimed to recognize Mr. Torres from his "prior arrests" and "gang membership." ER-86. But the officer "lost sight" of Mr. Torres and then drove around the block. ER-86. The officer saw a man that he "believed to be Torres" getting into a car. ER-115. The officer recorded the license plate number of the vehicle and began following it. ER-107, 115–16. A different, marked police car carrying Officer Wilson and Officer Euler also began following the same vehicle. ER-86.

### III. After Annabel parked and Mr. Torres was crossing the street, Officer Wilson orders Mr. Torres to stop.

Annabel drove through a residential neighborhood and parked her car at a section of the curb that was painted red. ER-86. Jaime and Mr. Torres both hopped out of the car. Mr. Torres walked around to the driver's side of the car and began crossing the street. ER-111. Annabel was still getting out of the driver's seat. ER-111.

Around this time, the undercover officer radioed for the marked police car to "make contact" with Annabel's vehicle. ER-86. As the body-cam footage shows, Officer Euler and Officer Wilson pulled up behind Annabel's vehicle and began getting out of their police car. *See* Exhibit E (Off. Euler body cam, 1:59); Exhibit F (Off. Wilson body cam, 2:01).

As Officer Wilson got out of his car, he ordered Mr. Torres to stop. Exh. F, 2:03. At this point, Mr. Torres was walking across the street away from the car, but he immediately complied and stopped.



Exh. E at 2:03.

Officer Euler began walking towards Mr. Torres and asked, "Whose car is this?" Exh. E at 2:03. A second later, Officer Wilson again commanded them to "stop," even though both Mr. Torres and Jaime had already stopped. Exh. F at 2:06.

## IV. After detaining Mr. Torres and asking about weapons, police find a gun and charge him with unlawful possession of a firearm.

After Officer Wilson twice ordered Mr. Torres and Jaime to stop, Officer Euler asked them, "Is that yours or yours?" referring to the car. Exh. E at 2:05. Mr. Torres began walking back to the car and pointing at Annabel to indicate it was hers. Exh. E at 2:06. Annabel also confirmed it was her car. Exh. E at 2:08. As the officers approached the car, they could clearly see Annabel standing in the open driver's door:



9

Exh. E at 2:08.

Officer Euler began lecturing the trio, stating that they "aren't in a parking spot," they're "parking in a red zone," and they're "hanging out in the middle of the street." Exh. E at 2:10–2:15. Annabel and Mr. Torres both responded that she was just dropping them off and was moving the car. Exh. E at 2:12–2:13. Annabel apologized and turned to get back inside the car to move it. Exh. E at 2:15.

Even though Annabel was getting back in the car to move it, Officer Euler tapped Mr. Torres on the arm. Exh. E at 2:17. Officer Euler then asked Mr. Torres, "you don't have any weapons on you, do you, partner?" Exh. E at 2:18. Mr. Torres responded, "No, sir." Exh. E at 2:19. But before Officer Euler could frisk him, Mr. Torres fled. Exh. E at 2:20.

Officers chased Mr. Torres and tackled him. Exh. E at 2:20–2:34. They found a rusty gun with several bullets that had presumably fallen out of Mr. Torres' waistband. ER-108. Because Mr. Torres had prior non-violent felonies for vandalism and possession of ammunition, the government charged him with unlawful possession of a firearm and ammunition under 18 U.S.C. § 922(g)(1). ER-40–42.

## V.   Mr. Torres moves to suppress the gun under the Fourth Amendment.

Mr. Torres filed a motion to suppress the evidence obtained as a result of the stop. ER-93–128. He argued that police lacked reasonable

suspicion to stop him given that he was not the owner or driver of the parked car and was already crossing the street when police arrived. ER-92–103. At a minimum, he requested an evidentiary hearing to resolve any contested issues of fact. ER-103.

The government opposed this motion to suppress, arguing that Mr. Torres had been a passenger of the parked car and police had "collective knowledge" that he was on probation and thus subject to a Fourth Amendment search waiver. ER-80–82. The government also argued that once the officers approached Mr. Torres, they could see that: 1) he was wearing "baggy clothing" and a Minnesota Twins hat that "advertis[ed]" gang affiliation; 2) he was with Jaime—a "known gang member"; and 3) he "evasively stood" with his back to Officer Euler. ER-82.

Mr. Torres rebutted the government's arguments. ER-64–71. First, he explained that the "collective knowledge" doctrine did not apply because the undercover officer "lost sight" of Mr. Torres and only told other officers to "make contact" with Annabel's *car*—not with Mr. Torres. ER-66–67, 86. He also refuted the government's reliance on "traffic stop" cases, since police did not pull Annabel over and Mr. Torres was already crossing the street when they arrived. ER-68–69. Mr. Torres also disputed the government's characterization of Chicano Park Day as a "gang holiday," the notion that Barrio Logan is a "high crime" area, and the claim that Mr. Torres wore "baggy clothing"

11

and "evasively stood" with his back to Officer Euler. ER-70–71. Because these were material facts in dispute, he also renewed his request for an evidentiary hearing. ER-71.

## VI.  Mr. Torres files a motion to dismiss the indictment under the Second Amendment.

In addition to his motion to suppress, Mr. Torres also filed a motion to dismiss the indictment under the Second Amendment. ER-55–63. He explained that in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022), the Supreme Court made clear that laws burdening the right to bear arms are constitutional only if they fall within a deeply rooted historical tradition of regulation. ER-57–58. But because the government had yet to identify any historical tradition that justifies 18 U.S.C. § 922(g)(1), that law was unconstitutional as applied to Mr. Torres. ER-60–62. Mr. Torres acknowledged that this issue was pending in the en banc case of *United States v. Duarte*, No. 22-50048, which would likely control the outcome of his motion. ER-62.

The government agreed with Mr. Torres that the en banc *Duarte* proceedings would control the outcome of this motion. ER-43. But it argued that the district court should either reserve ruling on the motion or deny it on the merits under this Court's pre-*Bruen* opinion in *United States v. Vongxay*, 594 F.3d 1111 (9th Cir. 2010). ER-43–44.

12

## VII. The district court denies both motions and declines to hold an evidentiary hearing.

In a subsequent motion hearing, the district court denied both of Mr. Torres' motions. ER-3–14.

First, the district court held that reasonable suspicion existed to justify Mr. Torres' stop. ER-6–8.[1] The court believed the officers were "investigating the traffic violation" to "determine who was driving the vehicle" and need not "accept" that Annabel was the car's driver. ER-6.

The court then laid out its reasons for believing Officer Euler had "reasonable suspicion that criminal activity may be afoot." ER-7. It relied on several things the officers knew at the moment Officer Wilson ordered Mr. Torres to stop, such as the claim that Chicano Park Day had "large gang gatherings where many gang members are armed" and that Mr. Torres was "wearing baggy clothing." ER-7.

But the district court also relied on things the officers did *not* know at the time of the stop—that Jaime was a "known gang member," that Mr. Torres was "associating" with Jaime, and that Mr. Torres was wearing a hat with the letters "TC," signifying "a known criminal street gang." ER-7. The court also relied on several things that were not necessarily related to any identifiable criminal activity, such as the fact

---

[1] At the start of its decision, the district court found "probable cause" for the stop, even though the standard was reasonable suspicion. ER-5. This misstatement may have stemmed from Mr. Torres' separate argument that the undercover officer lacked probable cause to believe that Mr. Torres was the person in the car. ER-65-66.

that Mr. Torres was "moving away from the vehicle" and Officer Euler "could not see [Mr. Torres'] hands." ER-7.

Because the court believed these factors were sufficient to establish reasonable suspicion, it found that it "need not reach" the question of whether police had collective knowledge of a Fourth Amendment search waiver. ER-8. The district court also denied Mr. Torres' motion to dismiss under the Second Amendment, concluding that *Vongxay* "remains binding authority after *Bruen*." ER-9.

Mr. Torres objected. ER-10–11. He renewed his request for an evidentiary hearing, noting that a number of the "stated reasons" the court relied on to find reasonable suspicion were "dispute[d] as a factual matter." ER-10. This included "representations the officer made about the nature of Chicano Park Day" as a "gang holiday," which Mr. Torres sought to rebut with his own declaration and by calling "expert witnesses in the social studies departments at the University of California San Diego." ER-10. It also included material disputes of fact over whether Mr. Torres was wearing "baggy clothes" and whether the officers could "see his hands." ER-11. The court rejected these requests for an evidentiary hearing, saying that it wasn't "need[ed]" because the officer was "familiar" with Chicano Park Day and the court itself had reviewed the body-cam footage. ER-11.

Mr. Torres entered into a conditional plea agreement with the government that permitted him to appeal the denial of his motion to

14

suppress and motion to dismiss. ER-22. The court then sentenced Mr. Torres to 30 months' imprisonment. ER-16. This appeal follows.

## SUMMARY OF THE ARGUMENT

Officer Wilson lacked reasonable suspicion to stop Mr. Torres. In *Terry v. Ohio,* the Supreme Court held that officers may only conduct a brief investigatory stop if they can point to "specific and articulable facts" indicating criminal activity that existed "at the moment of seizure." *Terry*, 392 U.S. at 21, 22. But here, the only "specific and articulable facts" at the "moment of seizure" were that Mr. Torres was walking away from a car on Chicano Park Day. In denying the motion to suppress, the district court legally erred by relying on facts that occurred *after* the initial seizure, were not indicative of criminal activity, or had no support in the record. At a minimum, the court erred by refusing to hold an evidentiary hearing to resolve the material facts in dispute that the court's legal conclusion relied on. Thus, this Court should remand with instructions to grant the motion to suppress or at least hold an evidentiary hearing.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, the Supreme Court made clear that laws burdening that right are constitutional only if they fall within a deeply rooted historical tradition of regulation. 597 U.S. 1, 17 (2022). But years after *Bruen*, the government has yet to identify any historical tradition that justifies imposing a lifetime firearms ban on all

15

persons with felony convictions under 18 U.S.C. § 922(g)(1). Thus, at least as applied to Mr. Torres, § 922(g)(1) is unconstitutional.

## ARGUMENT

### I. Officers had no reasonable suspicion to stop Mr. Torres at the "moment of seizure."

#### A. Standard of review

Whether police had reasonable suspicion to make an investigatory stop is a mixed question of law and fact this Court reviews de novo. *See United States v. Manzo-Jurado*, 457 F.3d 928, 934 (9th Cir. 2006); *United States v. Choudhry*, 461 F.3d 1097, 1100 (9th Cir. 2006). The Court reviews the district court's findings of fact for clear error. *See United States v. Lopez-Soto,* 205 F.3d 1101, 1103 (9th Cir. 2000). This Court reviews for abuse of discretion a district court's decision on whether to hold an evidentiary hearing on a suppression motion. *United States v. Howell*, 231 F.3d 615, 620 (9th Cir. 2000).

#### B. No reasonable suspicion of criminal activity existed at the moment of Mr. Torres' seizure.

In *Terry v. Ohio,* the Supreme Court held that police may only conduct a brief investigatory stop if they can point to "specific and articulable facts" indicating criminal activity that existed "at the moment of seizure." *Terry*, 392 U.S. at 21, 22. But here, the reasons the court relied on occurred *after* the initial seizure, were not indicative of

16

criminal activity, or were not supported by the record. Accordingly, the district court erred in denying Mr. Torres' motion to suppress.

### 1. The government has the burden to show "specific and articulable facts" indicating criminal activity at the "moment of seizure."

The Fourth Amendment provides that "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. In *Terry v. Ohio*, the Supreme Court set forth the seminal ruling on "the role of the Fourth Amendment in the confrontation on the street between the citizen and the policeman investigating suspicious circumstances." 392 U.S. 1, 4 (1968). To justify an intrusion on these "constitutionally protected interests of the private citizen," a police officer "must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion." *Id.* at 21.

Importantly, *Terry* also held that these "specific and articulable facts" must be "available to the officer *at the moment of the seizure.*" *Id.* at 22 (emphasis added). Thus, *Terry* explained, a court's inquiry must focus on two factors: whether the stop was "justified at its inception" and whether it was "reasonably related in scope" to those initial facts giving rise to the suspicion. *Id.* at 20.

17

A decade after *Terry*, the Supreme Court again emphasized these points, reversing the denial of a suppression motion because "none of the circumstances *preceding the officers' detention* of appellant justified a reasonable suspicion that he was involved in criminal conduct." *Brown v. Texas*, 443 U.S. 47, 51–52 (1979) (emphasis added). Two decades after that, the Supreme Court did the same, explaining that reasonable suspicion "must be measured by what the officers knew *before they conducted* their search." *Florida v. J.L.*, 529 U.S. 266, 271 (2000) (emphasis added). And this Court has acknowledged the same rule, holding that "'official suspicion must be measured by what the officers knew *before they conducted* their search,' not after." *United States v. Vandergroen*, 964 F.3d 876, 880 n.5 (9th Cir. 2020) (emphasis added) (quoting *Florida v. J.L.,* 529 U.S. at 271).

Moreover, "[t]he government bears the burden of proving that a warrantless search or seizure falls within an exception to the warrant requirement." *United States v. Job*, 871 F.3d 852, 860 (9th Cir. 2017). This means that prosecutors have the "burden of production" to "com[e] forward with specific and articulable facts" showing reasonable suspicion. *United States v. Willis*, 431 F.3d 709, 715 n.5 (9th Cir. 2005) (quotations omitted).

Here, then, the government must identify "specific and articulable facts" indicating that Mr. Torres was engaged in criminal activity and

18

that police were aware of those facts at the "moment of [his] seizure."

*Terry*, 392 U.S. at 21, 22.

> **2.    The only "specific and articulable" facts at the "moment of seizure" were that Mr. Torres was walking away from a car on Chicano Park Day.**

The government cannot meet its burden to show "specific and articulable facts" indicating that Mr. Torres was engaged in criminal activity at the "moment of [his] seizure." *Id*. This is because the only relevant facts officers knew at the time they ordered Mr. Torres to stop were that he was crossing the street after getting out of a car on Chicano Park Day.

The body-cam footage shows that when police pulled up behind Annabel's car, Officer Wilson commanded Mr. Torres to "stop." Exh. F at 2:03. Officer Euler then began walking towards Mr. Torres and asked, "Whose car is this?" Exh. E at 2:03. A second later, Officer Wilson again ordered Mr. Torres to "stop," even though he had already stopped. Exh. F at 2:06. Officer Euler then asked Mr. Torres and Jaime, "Is that yours or yours?" referring to the car. Exh. E at 2:05.[2] Because Officer Wilson twice "accost[ed]" Mr. Torres and "restrain[ed] his freedom to walk away," he had "seized" Mr. Torres in that moment. *Terry*, 392 U.S. at 16.

---

[2] Officer Wilson's repeated commands to "stop" can only be heard faintly on Officer Euler's body camera audio. Exh. E at 2:02, 2:04. But both Officer Wilson's commands to "stop" and Officer Euler's questions can be heard on Officer Euler's body cam. Exh. F at 2:04-2:08.

At that "moment of seizure," this is what Officer Wilson saw:



Exh. F at 2:03. And from his angle on the other side of the squad car, this is what Officer Euler saw:



Exh. E at 2:04. Nothing in these images or in that moment supported

20

the conclusion that "criminal activity may be afoot." *Terry*, 392 U.S. at 30.

These images show two men—one standing by a car and the other crossing the street. Mr. Torres' hands are in plain sight holding a small cardboard beverage container. His hat is not visible. His clothes are not necessarily "baggy." He is not causing or threatening any harm. In a similar Supreme Court case where a detainee "made no gestures indicative of criminal conduct, made no movements that might suggest an attempt to conceal contraband, and said nothing of a suspicious nature to the police officers," the Court held that the government could not "articulate any specific fact" justifying a Fourth Amendment stop. *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979).

The facts here also resemble those in *Brown v. Texas*, 443 U.S. 47 (1979). There, police observed two men "walking in opposite directions away from one another in an alley" known for drug transactions. *Id*. at 48–49. Police stopped one of the men even though they "did not claim to suspect [him] of any specific misconduct, nor did they have any reason to believe that he was armed." *Id*. at 49. The Court concluded that the mere fact that he was "in a neighborhood frequented by drug users, standing alone, is not a basis for concluding that appellant himself was engaged in criminal conduct." *Id*. at 52. Rather, his conduct was "no different from the activity of other pedestrians in that neighborhood." *Id*. So while officers may have an "understandable desire to assert a

police presence," that desire "does not negate Fourth Amendment guarantees." *Id.*

None of the earlier events of the day alter that conclusion. The officers' belief that Chicano Park Day is a "gang holiday" is precisely the type of "broad profile[ ]" that "cast[s] suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." *United States v. Sigmond-Ballesteros*, 285 F.3d 1117, 1121 (9th Cir. 2002). But courts must be "careful not to tar people with the sins of their neighbors" by assigning labels to "entire neighborhoods or communities in which members of minority groups regularly go about their daily business." *United States v. Montero-Camargo*, 208 F.3d 1122, 1138, 1139 n.32 (9th Cir. 2000) (en banc). Such labels, this Court explained, "unless properly limited and factually based, can easily serve as a proxy for race or ethnicity." *Id.* at 1138.

Nor could Mr. Torres' brief stop at the house party support a finding of reasonable suspicion. To begin, the mere fact that several people in the front yard expressed hostility towards the police does not mean they were engaged in *criminal* activity. *See Lewis v. City of New Orleans*, 415 U.S. 130, 132 (1974) (striking down a statute making it a crime to "curse or revile" police). And even if it did, that incident occurred half an hour before Mr. Torres arrived. ER-95. Moreover, when Mr. Torres arrived, he did not even enter the house or yard—he merely called through the gate for Jaime to come out. ER-95. So even if

22

expressions of hostility against police *were* indicative of criminal activity, "a person's mere propinquity to others independently suspected of criminal activity does not, without more," justify a Fourth Amendment stop. *Ybarra*, 444 U.S. at 91.

In sum, relying on Chicano Park Day as a "gang holiday," Mr. Torres' brief stop at the house party, or an alleged affiliation with gangs is the type of "prefabricated or recycled profile of suspicious behavior" that is "very likely to sweep many ordinary citizens into a generality of suspicious appearance merely on hunch." *United States v. Rodriguez*, 976 F.2d 592, 595 (9th Cir. 1992), *opinion amended on denial of reh'g,* 997 F.2d 1306 (9th Cir. 1993). Mr. Torres' conduct—hanging out in his neighborhood with his family and friends on Chicano Park Day—was "no different from the activity of other pedestrians in that neighborhood." *Brown*, 443 U.S. at 52.

### 3. The district court legally erred by relying on reasons that occurred after the "moment of seizure" or were related to officer safety, rather than suspicion of criminal activity.

In listing its reasons justifying the stop, the district court committed two legal errors. First, it relied on reasons that the officers only became aware of *after* the moment of seizure. Second, it relied on reasons that, even if true, related to officer safety, rather than suspicion of criminal activity.

23

First, the court relied on reasons that the officers only became aware of *after* the moment of seizure. The court purported to rely on allegations that: 1) Mr. Torres was wearing a Minnesota Twins baseball cap "signifying a known street gang"; 2) Jaime was a "known gang member"; and 3) Mr. Torres was "associating" with him. ER-7.

But the officers were not aware of these claims at the "moment of the seizure." *Terry*, 392 U.S. at 22. As explained, reasonable suspicion "must be measured by what the officers knew *before they conducted*" their search or seizure. *J.L.*, 529 U.S. at 271 (emphasis added). But here, body camera footage shows that the officers were not close enough to read Mr. Torres' hat *before* they told him to stop. Exh. F at 2:04. And Officer Wilson did not recognize Jaime until *after* he issued his commands to stop. Exh. F at 2:08. Thus, the officers' knowledge of these claims did not "preced[e] the officers' detention" and could not "justif[y] a reasonable suspicion that he was involved in criminal conduct." *Brown*, 443 U.S. at 51–52. Accordingly, the district court legally erred by relying on post hoc justifications for the stop.

Second, the court relied on reasons that, even if true, related to officer safety, rather than suspicion of criminal activity. While "a *Terry* stop is justified by reasonable suspicion that criminal activity may be afoot," a *Terry* frisk requires "reasonable suspicion that a suspect 'is armed and presently dangerous to the officer or to others.'" *Thomas v. Dillard*, 818 F.3d 864, 876 (9th Cir. 2016), *as amended* (May

24

5, 2016) (quoting *Terry*, 392 U.S. at 24). "Each element, the stop and the frisk, must be analyzed separately," and "the reasonableness of each must be independently determined." *Id.* (quoting *United States v. Thomas*, 863 F.2d 622, 628 (9th Cir. 1988)).

Here, the district court legally erred by citing reasons that related to officer safety—rather than criminal activity—to justify the initial *Terry* stop. For instance, it claimed that Mr. Torres was "wearing baggy clothing," officers "could not see [his] hands," and he was "moving away from the vehicle." ER-7. But these facts, even if true, are not indicative of criminal activity—for instance, a person walking away from a car with their hands in the pockets of a large coat presents no inherent signs of criminal activity. At most, these factors were relevant to the "independently determined" question of whether Mr. Torres was "armed and presently dangerous to the officer." *Dillard*, 818 F.3d at 876. But by conflating the reasonableness of the *stop* with the reasonableness of the *frisk*—two inquiries that must be "analyzed separately"—the district court legally erred. *Id.*

What's more, the factors cited here were not even enough to justify a *Terry* frisk. As one judge explained, gang affiliation "does not support a reasonable officer's inference that [the detainee] was *currently* armed and dangerous at the time of the stop." *United States v. Odom*, 588 F. Supp. 3d 1032, 1047 (N.D. Cal. 2022) (emphasis in original). "To hold otherwise," the court believed, "would permit officers to expand a stop

into a separate criminal investigation every time they stop an individual at night who has prior gun convictions or gang affiliations, even if the suspect does not engage in any sudden movements or suspicious behavior." *Id.* . As in *Sigmond-Ballesteros*, this would "cast suspicion on entire categories of people without any individualized suspicion of the particular person to be stopped." 285 F.3d at 1121.

### 4. Even the factors the district court *could* rely on did not justify a *Terry* stop.

Even if the district court *could* have legally relied on the factors it cited, these factors were either not supported by the record or did not create reasonable suspicion of criminal activity.

To begin, Mr. Torres' clothing was not necessarily "baggy":



Exh. E at 2:04. His jeans appear to fit normally, and his shirt hangs no

26

further than his hips. Characterizing his clothing as "baggy" is not only questionable but again relies on a "prefabricated or recycled profile of suspicious behavior" that is "very likely to sweep [in] many ordinary citizens." *Rodriguez*, 976 F.2d at 595.

But even if Mr. Torres' clothing *could* be characterized as "baggy," this would not create reasonable suspicion. In *Ybarra*, the Supreme Court noted that "wearing a ¾-length lumber jacket," which "could be expected on almost any tavern patron" in the area at that time of year did not create reasonable suspicion. 444 U.S. at 93. And this Court has held that "wearing baggy clothes," with "the pockets appearing to be full of items," does "not support the conclusion that [a detainee] was engaged in criminal activity" *United States v. Job*, 871 F.3d 852, 861 (9th Cir. 2017). Relying on *Job*, one judge thus held that "'baggy' clothes themselves do not justify reasonable suspicion that an individual is armed." *United States v. Rubio*, No. 2:24-CR-00542-MEMF-1, 2025 WL 220949, at *4 (C.D. Cal. Jan. 15, 2025)

Furthermore, the fact that Mr. Torres was "moving away from the vehicle" does not indicate criminal activity. ER-7. Once Annabel parked the car to drop off Mr. Torres and Jaime, it made perfect sense for Mr. Torres to "mov[e] away from the vehicle" to reach his destination. The government never claimed that the car contained contraband that Mr. Torres was trying to distance himself from. And to the extent the officers had any safety concerns, their decision to *prolong* the stop by

27

preventing Mr. Torres from leaving was actually "inversely related to officer safety," since it would have been *safer* to allow Mr. Torres to leave once the officers "determined there was no reason to cite him." *United States v. Evans*, 786 F.3d 779, 787 (9th Cir. 2015); *see also United States v. Landeros*, 913 F.3d 862, 868 (9th Cir. 2019) (noting that "prolonging the officers' exposure to Landeros, was, if anything, 'inversely related to officer safety'") (quoting *Evans*). Thus, half of the district court's justifications for the stop—that Mr. Torres was "wearing baggy clothing," officers "could not see [his] hands," and he was "moving away from the vehicle," ER-7—either are not supported by the record or do not contribute to a finding of reasonable suspicion.

Before listing its six factors, the court also attempted to justify the stop on the basis that officers were "investigating the traffic violation" because they were "not required to accept" the uncontroverted fact that Annabel was the driver of the car. ER-6. But this justification also fails for two reasons.

First, Officer Wilson's detention was not a "traffic stop." None of the officers' reports claimed to have pulled Annabel's car over or forced her to stop. Rather, the undercover officer told other officers to "make contact" with Annabel's car *after* it was already parked. ER-86. So cases where police officers *initiated* a traffic stop do not apply here.

Moreover, Officer Wilson's report (which Mr. Torres submitted in support of his motion) reflects that when he first pulled up, Mr. Torres

28

"had already exited the vehicle." ER-107. In fact, Mr. Torres had made his way around the vehicle and was in the process of crossing the street. ER-107. Only when Officer Wilson "yelled 'stop'" did Mr. Torres "turn[ ] around" and walk back to the car. ER-107. In other words, when Officer Wilson first encountered Mr. Torres, he was a pedestrian—not the passenger of a car.

The government argued below that because the car was parked in a red zone, the officers had a duty to "investigate" who was the driver. ER-107. But this is suspect for two reasons. First, police who discover a parking violation generally do not "investigate the driver"—they issue a parking citation and leave it on the car. In fact, as a San Diego municipal website shows, city officials who issue parking citations do not even have a space on the citation to write in the name of the car's driver or owner:[3]



So it makes no sense that officers would need to "investigate the driver" when the driver's identity is irrelevant for a parking citation.

_____

[3] *See* https://www.sandiego.gov/parking/citations/hcitation (labels in original).

What's more, the police report shows that officers already had the license plate number of Annabel's car at the time they pulled it over. ER-115. Because they had been following the car for several minutes, they had likely run the license plate number in the police database and knew Annabel was the owner. So police had no reason to "investigate who was the driver" when all signs pointed to Annabel.

But even if police *did* need to "investigate who was the driver," the answer to this was quickly apparent. As the body cam footage shows, police saw that the driver's door was open and Annabel had just stepped out of the driver's seat:



Exh E at 2:09. When Officer Wilson asked, "whose car it was," both she and Mr. Torres confirmed that it was Annabel's. Exh. E at 2:06–2:09. And when Officer Wilson complained that the car was parked in a red zone, both Annabel and Mr. Torres immediately said that she would move it. Exh. E at 2:11–2:13. So even if Officer Wilson *did* need to "investigate whose car it was," there was no question at this point that Annabel was both the car's owner and driver. Thus, by "exceeding the time needed to handle the matter for which the stop was made," the officers "violate[d] the Constitution's shield against unreasonable seizures." *Rodriguez v. United States*, 575 U.S. 348, 350 (2015); *see also Landeros*, 913 F.3d at 866 (holding that "law enforcement may not extend a traffic stop with tasks unrelated to the traffic mission, absent independent reasonable suspicion").

In sum, the district court committed two legal errors—it considered factors that were only apparent after the "moment of seizure" and factors relating to a *Terry* frisk, rather than a *Terry* stop. But even if those factors *could* be considered, and were factually accurate, they did not create reasonable suspicion of criminal activity.

### C. At a minimum, this Court should remand for an evidentiary hearing on the material facts in dispute.

Because the government did not present "specific and articulable facts" giving rise to reasonable suspicion of criminal activity "at the moment of seizure," this Court should remand with instructions to

31

grant the motion to suppress. *Terry*, 392 U.S. at 21, 22. But at a minimum, this Court should remand with instructions to conduct an evidentiary hearing.

This Court's cases "*require* the district court to conduct an evidentiary hearing when the moving papers filed in connection with a pre-trial suppression motion show that there are contested issues of fact relating to the lawfulness of a [seizure]." *United States v. Mejia*, 69 F.3d 309, 318 (9th Cir. 1995) (emphasis in original). To be sure, courts need only do so when "the moving papers allege facts with sufficient definiteness, clarity, and specificity to enable the trial court to conclude that contested issues of fact exist." *United States v. Howell*, 231 F.3d 615, 620–21 (9th Cir. 2000). But when the moving papers *are* "sufficiently definite, specific, detailed, and nonconjectural," an evidentiary hearing "ordinarily is required." *United States v. Walczak*, 783 F.2d 852, 857 (9th Cir. 1986).

Here, that standard was easily met. Mr. Torres requested an evidentiary hearing on three separate occasions: 1) in his motion to suppress; 2) in his reply; and 3) at the motion hearing. ER-10–11, 70–71, 103. In his reply, for instance, he contested numerous material facts the government relied on, including that 1) Chicano Park Day was a "gang holiday," 2) the neighborhood was a "dangerous or high-crime area," 3) Mr. Torres was wearing "baggy clothing," 4) Jaime's presence as a "known gang member" increased the suspicion against Mr. Torres,

32

and 5) the officers "reasonably believed" that Mr. Torres was actually the driver. ER-70–71. At the motion hearing, Mr. Torres then renewed this request, specifically disputing the district court's reliance on "the nature of Chicano Park Day" and requesting to present testimony from expert witnesses from the University of California at San Diego on this issue. ER-10. Mr. Torres also disputed whether the record in fact showed he was wearing "baggy clothing" and the officers "couldn't see his hands," both of which were "belied by the body-worn camera footage." ER-11.

These disputed issues of fact were "sufficiently definite, specific, detailed, and nonconjectural" to justify an evidentiary hearing. *Walczak*, 783 F.2d at 857. Not only that, the disputed material facts comprised three of the six rationales the district court relied on to find reasonable suspicion. ER-7. And the district court did not disagree that these material facts were in dispute—it only stated that it had "reviewed the body-worn camera video" and that an evidentiary hearing was not "need[ed]" because "the officer is familiar with" it and has been "on that team during that day." ER-11. In other words, the district court simply accepted the officer's declaration that Chicano Park Day is a "gang holiday" over Mr. Torres' declaration that the Day is "not about gangs or crime" but rather a "celebration of family, community, and our culture." ER-111, 119.

But the "purpose of requiring an evidentiary hearing, rather than permitting a decision to be based solely on written declarations, is to ensure that the district judge is presented with the information necessary to evaluate the truthfulness of the declarants." *Mejia*, 69 F.3d at 318. Here, the district court's wholesale adoption of the officers' "gang holiday" characterization did not just affect Mr. Torres—it branded every resident of Barrio Logan with "the sins of their neighbors." *Montero-Camargo*, 208 F.3d at 1139 n.32. This is precisely what the en banc Court in *Montero-Camargo* warned against when it required district courts to "carefully examine the testimony of police officers" to ensure that their claims are "more than mere war stories." *Id.* at 1138, 1139 n.32. Rather, courts must "examine with care the specific data underlying any such assertion" to "make a fair and forthright evaluation of the evidence." *Id.* Thus, the district court should have accepted Mr. Torres' invitation to consider actual data on Barrio Logan's crime rate or the prevalence of past alleged incidents of violence on Chicano Park Day. ER-10, 70.

As shown above, the body camera footage also does not necessarily support the district court's belief that Mr. Torres was wearing "baggy clothing" and that officers had "difficulty in seeing [his] hands." ER-7. In similar cases, this Court has held that when "body camera footage supports Defendant's contention that [drug paraphernalia] was not in plain sight on the back seat," the district court "abused its discretion in

34

failing to conduct an evidentiary hearing on the motion to suppress."
*United States v. Garcia*, No. 22-50106, 2024 WL 32727, *1 (9th Cir. Jan. 3, 2024). Similarly, this Court remanded for an evidentiary hearing when a district court "abused its discretion by resting its decision on a factual finding that [an officer's] view was obscured" when "this notion is unsupported by the record." *United States v. Dorsey*, No. 23-2714, 2024 WL 4379733, *2 (9th Cir. Oct. 3, 2024); *see also United States v. Eusebio Gonzalez*, 798 F. App'x 171, 172 (9th Cir. 2020) (remanding for an evidentiary hearing where the record "undercuts" the district court's finding).

Because more than half of the district court's reasons for finding reasonable suspicion are either not supported by the record or at least subject to material dispute, this Court should remand for an evidentiary hearing if it does not grant the motion to suppress.

## II. Mr. Torres' conviction violates the Second Amendment.

### A. Standard of review

This Court reviews the constitutionality of a statute de novo. *United States v. Vongxay*, 594 F.3d 1111, 1114 (9th Cir. 2010).

### B. Section 922(g)(1) is unconstitutional as applied Mr. Torres.

Mr. Torres acknowledges that *United States v. Duarte*, 137 F.4th 743 (9th Cir. 2025) (en banc), currently forecloses the argument that his conviction violates the Second Amendment as applied to him.

Nevertheless, he presents this argument to preserve it for future litigation.

In *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022), the Supreme Court made clear that laws burdening the right to bear arms are constitutional only if they fall within a deeply rooted historical tradition of regulation. Specifically, *Bruen* established a two-part test for deciding whether a firearm regulation accords with the Second Amendment. First, courts must ask whether "the Second Amendment's plain text covers an individual's conduct." *Bruen*, 597 U.S. at 17. If so, "the Constitution presumptively protects that conduct." *Id*. Second, the government can rebut that presumption only by "demonstrat[ing] that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id*. "Only if a firearm regulation is consistent with this Nation's historical tradition may a court conclude that the individual's conduct falls outside the Second Amendment's 'unqualified command.'" *Id*.

Here, Mr. Torres' conduct is presumptively lawful because it falls within the Second Amendment's plain text. As an initial matter, *Duarte* correctly held that a prior felony does not "remove [a defendant] from the ambit of the Second Amendment." 137 F.4th at 755. Mr. Torres therefore "is one of 'the people' who enjoys Second Amendment rights." *Id*. The Second Amendment's plain text also protects Mr. Torres' "proposed course of conduct"—that is, "to possess and carry weapons in

36

case of confrontation.'" *Bruen*, 597 U.S. at 32 (quoting *District of Columbia v. Heller*, 554 U.S. 570, 592 (2008)). Thus, Mr. Torres' possession of a firearm for self-defense is "presumptively guarantee[d]" unless the government meets its burden to prove that § 922(g)(1) "is consistent with this Nation's historical tradition of firearm regulation." *Id.*

The government cannot meet this burden. The historical case for § 922(g)(1)'s limited constitutionality is well documented in court of appeals opinions. *See Range v. Att'y Gen. United States*, 124 F.4th 218, 230 (3d Cir. 2024); *United States v. Diaz*, 116 F.4th 458, 469–70 (5th Cir. 2024); *United States v. Williams*, 113 F.4th 637, 663 (6th Cir. 2024); *United States v. Duarte*, 101 F. 4th 657, 662 (9th Cir. 2025) at 662, *withdrawn on reh'g en banc*, No. 22-50048, 2025 WL 1352411 (9th Cir. May 9, 2025); *Duarte*, 137 F.4th at 780–805 (VanDyke, dissenting in part).

After sifting through the historical record, the Third, Fifth, and Sixth Circuits each identified gaps that prevent the government from applying § 922(g)(1) to certain people with felony convictions. The Third Circuit has deemed § 922(g)(1) unconstitutional, at a minimum, when the government presents "no evidence that [the defendant] poses a physical danger to others or that [the underlying felony] is closely associated with physical danger." *Range v. Att'y Gen. United States*, 124 F.4th 218, 230 (3d Cir. 2024). The Fifth Circuit will uphold a § 922(g)(1)

37

conviction only if "at least one of the predicate crimes that [the] conviction relies on . . . was a felony" at the Founding "and thus would have led to capital punishment or estate forfeiture." *United States v. Diaz*, 116 F.4th 458, 469–70 (5th Cir. 2024). And the Sixth Circuit affirms § 922(g)(1) convictions only if the defendant had an "opportunity to make an individualized showing that he himself is not actually dangerous." *United States v. Williams*, 113 F.4th 637, 663 (6th Cir. 2024). Under any of these standards, § 922(g)(1) cannot be applied here.

First, the government has provided no evidence that Mr. Torres poses a physical danger to others or that his underlying convictions are closely associated with danger. *Range*, 124 F.4th at 230. Mr. Torres' only prior convictions are for felonies involving vandalism and possession of ammunition, which the government admitted were "not violent." ER-44, 53. And the government has pointed to no evidence showing that Mr. Torres has ever committed violent or dangerous acts.

Second, there is no evidence that Mr. Torres' vandalism conviction "would have led to capital punishment or estate forfeiture" at the Founding. *Diaz*, 116 F.4th at 469–70. The government bears the burden to prove the predicate's historical pedigree. *See id.* at 467, 472. If it fails to put forward evidence sufficient to make that showing, Mr. Torres' conviction is unconstitutional under the *Diaz* rule, too.

Finally, separate and apart from the Third, Fifth, and Sixth Circuit's rules, Mr. Torres preserves the more general claim that the

38

government has not met its burden to prove that § 922(g)(1) constitutionally applies in the circumstances of Mr. Torres' particular case. For these reasons, the government has not proved that this prosecution falls within a deeply rooted historical tradition, and this Court should remand with instructions to dismiss the indictment.

## CONCLUSION

For these reasons, this Court should suppress the evidence under the Fourth Amendment, remand with instructions to conduct an evidentiary hearing, or vacate his conviction.

Respectfully submitted,

DATED:    August 14, 2025

*/s/ Kara Hartzler*
KARA HARTZLER
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California 92101-5030
Telephone: (619) 234.8467

Attorneys for Defendant-Appellant

39

## CERTIFICATE OF RELATED CASES

Counsel is not aware of any related cases pending before the

Court.

Respectfully submitted,

DATED:    August 14, 2025

*/s/ Kara Hartzler*

KARA HARTZLER
Federal Defenders of San Diego, Inc.
225 Broadway, Suite 900
San Diego, California    92101-5030
Telephone: (619) 234.8467

Attorneys for Defendant-Appellant

40

**UNITED STATES COURT OF APPEALS
FOR THE NINTH CIRCUIT**

**Form 8. Certificate of Compliance for Briefs**

*Instructions for this form:* *http://www.ca9.uscourts.gov/forms/form08instructions.pdf*

**9th Cir. Case Number(s)**   | 25-3281 |

I am the attorney or self-represented party.

**This brief contains** | 8,435 | **words, including** | 89 | words

manually counted in any visual images, and excluding the items exempted by FRAP

32(f). The brief's type size and typeface comply with FRAP 32(a)(5) and (6).

I certify that this brief *(select only one)*:

○ complies with the word limit of Cir. R. 32-1.

○ is a **cross-appeal** brief and complies with the word limit of Cir. R. 28.1-1.

○ is an **amicus** brief and complies with the word limit of FRAP 29(a)(5), Cir. R. 29-2(c)(2), or Cir. R. 29-2(c)(3).

○ is for a **death penalty** case and complies with the word limit of Cir. R. 32-4.

○ complies with the longer length limit permitted by Cir. R. 32-2(b) because *(select only one)*:

☐ it is a joint brief submitted by separately represented parties.
☐ a party or parties are filing a single brief in response to multiple briefs.
☐ a party or parties are filing a single brief in response to a longer joint brief.

○ complies with the length limit designated by court order dated |                | .

○ is accompanied by a motion to file a longer brief pursuant to Cir. R. 32-2(a).

**Signature** | s/ Kara Hartzler |  **Date** | 8/14/25 |

*(use "s/[typed name]" to sign electronically-filed documents)*

*Feedback or questions about this form? Email us at forms@ca9.uscourts.gov*

**Form 8**                                                                 *Rev. 12/01/22*